IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION


| | | |
|---|---|---|
| SANDRA KAY LeMARR, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | 2:09-CV-0060 |
| | § | |
| MICHAEL J. ASTRUE, | § | |
| Commissioner of Social Security, | § | |
| | § | |
| Defendant. | § | |


**REPORT AND RECOMMENDATION
TO AFFIRM THE DECISION OF THE COMMISSIONER**

Plaintiff SANDRA KAY LeMARR brings this cause of action pursuant to 42 U.S.C. §

405(g), seeking review of a final decision of defendant MICHAEL J. ASTRUE, Commissioner of

Social Security (Commissioner), denying plaintiff's application for supplemental security benefits

(SSI).  Both parties have filed briefs in this cause.  For the reasons hereinafter expressed, the

undersigned United States Magistrate Judge recommends the Commissioner's decision finding

plaintiff not disabled and not entitled to benefits be AFFIRMED.


I.
THE RECORD

Plaintiff filed an application for SSI benefits on November 21, 2003, alleging she became

disabled on December 30, 1997 (Tr. 103, 106), and unable to work due to impairments of

rheumatoid arthritis, fibromyalgia, and sickle cell anemia.[1]  (Tr. 98-99A).  Plaintiff alleged she is

not able to work because she is not able to move her "entire body," especially her hands and arms,

due to the arthritis and fibromyalgia.  (Tr. 106).  Plaintiff advised her impairments cause her to have

continuous pain "all over," that weather, sleep loss and stress makes the pain worse, and that

combining her medications of Xanax, Lortab and Darvocet is the only way to relieve the pain.  (Tr.

125-26).  Plaintiff advised her impairments do not limit her sitting, limit standing to about 10-15

minutes and walking to about 20 minutes.  (Tr. 132).  Plaintiff explained her physical problems

limit her daily activities due to pain, weakness, loss of mobility, and fatigue.  (Tr. 137-38, 139-45).

Plaintiff also stated she had mental or emotional problems that limit what she is able to do,

identifying an inability to remember the things she needs to do which, in turn, makes her emotional.

Plaintiff acknowledged, however, that she had not been seen by a medical professional for

emotional or mental problems that limit her ability to work.  (Tr. 108, 133).  Plaintiff described her

average day as trying to do house work, make herself presentable, and help out with her son.  (Tr.

134).  Plaintiff advised her arms and hands become very tired when caring for her personal needs,

that she does cook when she feels up to it, and that it sometimes takes her all day to do the laundry

and dishes.  (Tr. 135).  Plaintiff opined it would help if she could afford the medication she needs.

(Tr. 136).

Plaintiff identified jobs held in the previous 15 years as housekeeper, hospice care worker,

and landscaper/sprinkler installer.  (Tr. 107).  Plaintiff  advised she last worked February 1, 1996.

Plaintiff indicated she obtained her GED in 1978, did not attend special education classes, and had

not received any additional special job training.  (Tr. 112).  At the time she filed her application,

---

[1]An application with this filing date, referenced by the ALJ in his decision, is not part of the record.  An SSI application dated
March 1, 2004, however, is part of the record.  (Tr. 98-99A).

plaintiff was 40-years-old.

The Social Security Administration denied benefits initially[2] and upon reconsideration.[3]  (Tr. 21-22, 24-40).  On July 19, 2007, an administrative hearing on plaintiff's claims was held before an Administrative Law Judge (ALJ).  (Tr. 298-337).  Plaintiff was represented by counsel at the hearing.

The medical records before the ALJ at the hearing reflect the earliest report concerning plaintiff's alleged impairments was entered May 19, 1998.  This report, presumably from Dr. Constantine Saadeh, a rheumatologist, noted plaintiff's complaints of "having pain all over her body" and "everywhere in her bone" beginning several years prior with concentration of pain in the hands, feet, left third finger and hips.  (Tr. 148-49).  Plaintiff reported she had tried multiple medications for pain without much relief and currently was taking only Darvocet (used to relieve mild to moderate pain) as needed.  Plaintiff reported previous testing for systemic lupus erythematosus and rheumatoid arthritis had been negative.  Plaintiff reported generalized weakness, some headaches, pain in the eyes, and easy bruisability.  Plaintiff denied having any morning stiffness or swelling in the joints, advised she functions at a 3 on a scale of 1 to 5, has problems

---

[2]In 2004, a state agency noted plaintiff claimed she is disabled because of rheumatoid arthritis, fibromyalgia and sickle cell anemia, but determined plaintiff's condition and current symptoms were not severe enough to be considered disabling under the Social Security guidelines. Noting plaintiff said she has pain, the agency found the evidence did not show her ability to perform basic work activities was as limited as she indicated and concluded her overall medical condition does not limit her ability to work.  (Tr. 36).

In 2005, a state agency noted plaintiff claimed she is disabled because of rheumatoid arthritis, fibromyalgia, sickle cell disease, depression and memory loss, but determined plaintiff's condition and symptoms were not severe enough to be considered disabling under Social Security guidelines.  The agency determined the evidence did not show plaintiff's ability to perform basic work activities was as limited as she indicated and concluded plaintiff's overall medical condition does not limit her ability to work.  (Tr. 30).

[3]In 2005, upon reconsideration, a state agency noted plaintiff claimed she is disabled because of memory loss, arthritis, fibromyalgia, allergies, poor balance, and sickle cell disease, but determined plaintiff's condition and current symptoms were not severe enough to be considered disabling under the Social Security guidelines.  The agency determined that although plaintiff claimed multiple impairments, the evidence did not show her ability to perform basic work activities was as limited as she indicated and concluded her overall medical condition does not limit her ability to work.  (Tr. 39-40).

with walking, going to sleep and staying asleep because of pain, and "problems with working at times." Plaintiff's examination showed no abnormalities with any systems.  Plaintiff's extremities were symmetrical, with full range of motion, equal tone and strength, no cyanosis or edema was present, and no joint tenderness, effusion, or synovitis was found.  Dr. Saadeh noted labs from Dr. Victor Bravo showed negative ANA rheumatoid factor, normal biochemical profile and thyroid panel, and no evidence of "ankylosing spondylitis."  Based on his examination of plaintiff, her complaints, and Dr. Bravo's lab reports, Dr. Saadeh opined that plaintiff has "quite severe" fibromyalgia[4] and has not responded to the regular treatment.  Dr. Saadeh prescribed physical therapy and a low dose of Elavil (used to treat symptoms of depression) to be used with her Darvocet.  Dr. Saadeh opined that if plaintiff did not respond to this treatment after two months, he would consider giving injections.  This report was the only medical record from Dr. Saadeh in the administrative record.

On January 20, 1999, plaintiff presented to Dr. Bravo with a complaint of "aching all over." (Tr. 176).  Dr. Bravo noted plaintiff's history of fibromyalgia, found she was "doing reasonably well," and noted some bruising of the lower leg.  The doctor prescribed Darvocet to be used "sparingly for severe pain," Flexeril for nocturnal cramping, and administered a vitamin B12 shot. Several more prescriptions for Darvocet were issued to plaintiff through 1999.

On November 11, 1999, plaintiff presented to Dr. Bravo with complaints of "muscle spasms all over and fatigue."  (Tr. 176).  Plaintiff was provided handouts on fibromyalgia but was not given any medications at this visit.  Plaintiff was, however, prescribed Darvocet on three (3) more

---

[4]Fibromyalgia is a disorder characterized by widespread musculoskeletal pain accompanied by fatigue, sleep, memory and mood issues.  For the diagnosis of fibromyalgia, two criteria must be met: (1) widespread pain lasting at least three months, and (2) no other underlying condition that might be causing the pain (modified from 1990 criteria that required at least 11 positive tender points out of a total possible of 18).  While there is no cure for fibromyalgia, a variety of medications can help control symptoms. Exercise, relaxation and stress-reduction measures also may help. *Mayo Clinic*, http://www.mayoclinic.com/health/fibromyalgia/DS00079.

occasions in 2000, and was prescribed Ultram (used to relieve moderate to moderately severe pain) in April 2001.

On May 6, 2002, plaintiff presented to Dr. Bravo with a complaint of a knot on the back of her leg, "significant pain and irritation sometimes in the muscles and legs." (Tr. 175). Dr. Bravo concluded plaintiff probably had an irritated vein that she rubbed too hard, breaking it. The doctor noted plaintiff's history of leg cramps and fibromyalgia, ordered blood work (which came back normal), and prescribed Ultram.

On May 11, 2004, Dr. Raj Saralaya performed a consultative examination of plaintiff for the Texas Rehabilitation Commission concerning plaintiff's complaints of generalized aches and pains, development of knots on her body which then cause bruising, and right thumb pain, ongoing since 2001. (Tr. 152-59). Plaintiff reported waking up with stiffness "all over" which gets better after she is active, of bright lights causing headaches, of short term memory problems and poor concentration which she attributed to her medications, and of right thumb pain. Plaintiff reported current medications as Xanax (used to treat anxiety disorders), Marinol (used to treat nausea, vomiting and loss of appetite), and Darvocet. Upon examination, Dr. Saralaya noted plaintiff was sitting calmly on the examining table in no acute distress. Plaintiff had no edema, had a normal gait, could walk in a straight line and tandem walk, was able to stand on toes and heels, and could squat halfway. Range of motion was normal as to all extremities and the spine, hand grip was good and coordination was normal. Dr. Saralaya opined plaintiff has a history of generalized aches and pains, headaches, and right thumb pain.

On June 22, 2004, plaintiff presented Dr. Bravo with a "Medical Release/Physician's Statement" form provided by the Department of Human Services (DHS). (Tr. 164-65, 297). The form explained plaintiff had applied for benefits with DHS, that regulations require that persons

receiving benefits work or participate in activities to prepare them for work unless they are physically or mentally incapable of working, and that plaintiff was claiming such a disability.  Dr. Bravo completed the form, indicating plaintiff "is unable to work, or participate in activities to prepare for work, at all," and that such a disability is permanent.  As his primary disabling diagnosis Dr. Bravo listed fibromyalgia and as "comments" noted, "[Patient] has seen Dr. Saadeh in past for this."

On December 14, 2004, plaintiff presented to the emergency department of Northwest Texas Hospital with complaints of "pain all over my body" and dizziness.  (Tr. 179).  Noting plaintiff's medical history of fibromyalgia, plaintiff was instructed to take Motrin and directed to followup with Dr. Bravo.  Plaintiff was ambulatory when she left the hospital.[5]

On January 22, 2005, Dr. Victor Guerrero performed a consultative disability examination. (Tr. 184-86).  Plaintiff reported to Dr. Guerrero that she forgets where she is driving or what she is doing at times, but was aware of the year, the president, where she was and why she was there. Plaintiff reported she had been diagnosed with fibromyalgia and rheumatoid arthritis, "has some trouble sitting and standing due to pain in her joints," and "is unable to lift or carry heavy items due to her arms and hands hurting her."  Plaintiff reported the pain is severe on a daily basis and that she uses a cane to get around, even though she did not bring the cane to the examination and a cane had not been prescribed.  Plaintiff reported medications of Lortab (used to relieve moderate to severe pain) and Xanax, that she has her GED education, and last worked in 1997.  Upon examination, Dr. Guerrero found plaintiff was in no acute distress, was able to get on and off the examination table without difficulty or assistance, and was not using an assistive device.  All systems and extremities

---

[5]The record contains a notation that plaintiff called disability services on December 21, 2004 and advised them she was hospitalized at Northwest Texas Hospital from December 7, 2004 to December 20, 2004 with a diagnosis of fibromyalgia.  (Tr. 221).  The record does not contain documentation for any such hospitalization.

were found to be normal.  Plaintiff had normal gait and station, no signs of ataxia or unsteadiness, was able to stand on heels and toes, bend all the way over and get back up, and squat all the way down and rise up without difficulty.  Although plaintiff indicated generalized pain in her upper and lower extremities, there was no evidence of inflammation, effusion or swelling in any of the joints tested and her straight-leg raising signs were negative.  Handgrip was normal and symmetric, there was no atrophy or rigidity, fine finger movements were normal, and plaintiff had normal ability to handle small objects and to fasten buttons on clothing, even though plaintiff advised her boyfriend had to help her get dressed on the morning of the exam.  Dr. Guerrero opined plaintiff has fibromyalgia which, according to plaintiff, is limiting her ability to work.  The doctor advised plaintiff would need ongoing pain management for her condition and care from a physician.  As to plaintiff's alleged memory problems, the doctor advised she would need ongoing management and evaluation of her condition.

On February 7, 2005, x-rays of plaintiff's left hand in response to her complaints of hand pain revealed no significant osteoarthritic changes.  (Tr. 189).

On February 15, 2005, plaintiff was denied service by Texas Panhandle Mental Health Mental Retardation because her depression appeared to be related to her chronic pain and missing her son.  (Tr.

On March 4, 2005, Dr. Addison Gradel conducted a consultative mental status examination for Disability Determination Services.  (Tr. 190-93).  At her exam, plaintiff was ambulatory without assistance or spasticity.  Plaintiff advised she had not driven in six (6) months since she had a wreck.  Plaintiff advised she had not worked as a nurse since 1997 when her doctor told her to quit working.  Plaintiff reported her numerous medications "help" the fibromyalgia, but that her sleep is "mostly pain."  Plaintiff reported she is able to dress, bathe and care for her personal hygiene, but

sometimes needs assistance when dressing.  Plaintiff reported she is able to prepare food, but that her boyfriend did most of the cooking.  Plaintiff reported she makes her bed daily, but that the laundry and housekeeping takes her 5 - 6 hours to complete and leaves her fatigued.  Plaintiff advised that with the help of her son she shops, makes grocery purchases and chooses her clothing. Plaintiff advised she is able to handle her own finances, attends church on Sundays, and makes "pow wow" dresses, although her boyfriend has to sew the beads together.  Plaintiff reported she has her GED and had a drug problem 23 years prior.  Plaintiff successfully performed various mental status tests, her thought processes were goal directed, and her thought content was coherent and logical.  Dr. Graddel's diagnoses consisted of a "[m]ood disorder due to the side effects of medications with reported memory disturbance," and "[p]ain disorder due to the medical condition and the associated psychological factors."  Dr. Graddel opined plaintiff's mental emotional disorder is stable with the current prescribed medications, but that her pain remains problematic.

The record also contained additional case reviews and assessments by non-examining physicians, completed in 2005, which found plaintiff's impairments to be non-severe.  (Tr. 194-208).

Records from the Texas Department of Criminal Justice (TDCJ) dated January - September 2006 were also included in the record.[6]  A January 17, 2006 physical exam reflects plaintiff had no complaints but reported a past medical history of schizophrenia, substance abuse, fibromyalgia, arthritis and glaucoma.  (Tr. 279).  Examination revealed bony changes in plaintiff's right thumb, and resulted in a diagnosis of arthritis and an ibuprofen medication regimen.  A January 30, 2006

---

[6]On February 17, 2004, plaintiff was convicted of theft and assessed a 5-year probated sentence in Potter County, Texas.  *See State v. LeMarr*, No. 47,834.  On December 7, 2005, plaintiff was convicted of credit or debit card abuse and was sentenced to 18 months in state jail in Potter County, Texas.  *See State v. LeMarr*, Nos. 50,989, 51,832.  On that same date, plaintiff's probation was revoked and she was sentenced to 18 months in state jail.  TDCJ records submitted with this case reflect initial evaluations beginning January 11, 2006.

nursing assessment reflects plaintiff complained of severe, constant muscle pains and arthritis in her legs and right hand. (Tr. 262). Objective data found stiffness in the joints, but full range of motion in all affected areas, normal movement, gait and posture, and no edema. Treatment offered was cold packs, moist heat, and either acetaminophen or ibuprofen, and plaintiff's instructions were to elevate her extremities as much as possible and to limit her physical activity or sports. (Tr. 263).

"Health Summary for Classification" forms from TDCJ dated January 17, 2006 and May 3, 2006 indicated no restrictions on units, housing, disciplinary processing, treatment plans, row assignment, or transportation. Plaintiff's work assignments were to be limited to those without climbing and her bunk was restricted to the lower bunk only. (Tr. 237, 277).

At various times of her incarceration, plaintiff was prescribed Celexa (used to treat depression) for a diagnosis of "major depressive disorder, recurrent, moderate" but the prescription was discontinued due to poor compliance. (Tr. 233-34, 238, 246-50). Plaintiff was also provided ibuprofen twice daily for her complaints of pain (Tr. 278). Plaintiff's memory was found to be within normal limits (Tr. 251). The record also reflects various refusals of treatment and "no shows" for requested appointments.

Plaintiff testified at the July 19, 2007 hearing that in 1995, she worked as a housekeeper at a nursing home, which work included buffing floors with a heavy machine. (Tr. 303). Plaintiff testified she worked full-time with her husband in their landscaping business from 1996 to 2001 during which time she mowed, set flags for sprinkler systems, planted flowers and other miscellaneous lawn care. (Tr. 303-04). Plaintiff explained she had to quit doing landscape work in 2001 because she "started falling behind the mower." (Tr. 307). Plaintiff testified she was in prison from 2005-2007 for writing approximately $9,000 in hot checks. (Tr. 302). Plaintiff testified she went to school "[t]o the 11th grade," and took the test for a GED but did not pass. (Tr.

306).

Plaintiff testified she is unable to work because her "whole body" (clarified as legs, arms and shoulders) "constantly throbs" and she does not have the "energy to fight the pain." (Tr. 307). Plaintiff averred the pain "intensifies" when she physically exerts herself and she has to lay down until her "muscles relax." (Tr. 308). Plaintiff described her pain as constant and as an 8 or 8 ½ on a scale of 10, even during the hearing. Plaintiff also testified she has trouble lifting things, raising her arms, or gripping small objects, and that "[s]ometimes it hurts to walk" and the bottom of her heel will hurt and bruise. Plaintiff stated she tires very easily to the point of fatigue, especially with physical exertion. (Tr. 308-10). Plaintiff described her typical day as "struggling" to keep up with her housework, doing household chores in 15-20 minute increments, or "staying on her feet" 30 to 45 minutes if she pushes herself, which takes her all day to clean the house. (Tr. 311-12). Plaintiff testified she is able to put laundry in the washer and begin cooking meals with her son assisting in the completion of such tasks. Plaintiff testified she lies in bed and rests for about two (2) hours between each exertional increment, sometimes reading while resting. (Tr. 312). Plaintiff testified she can only sit for 15-20 minutes at a time before her hip begins to hurt badly. (Tr. 313). Plaintiff estimated she can lift 10-15 pounds at a time, but explained she has to use both hands to hold a milk carton. Plaintiff advised she only walks around the house or out to the car, and that if she walks any greater distances, her legs become fatigued, "charley-horsing," and bruising and knotting. Plaintiff explained she was not currently taking any medications because she did not have the money to pay for them. (Tr. 311).

Plaintiff testified Dr. Constantine Saadeh diagnosed her with fibromyalgia and sickle cell trait in 1998, attributed her easy bruising to the fibromyalgia, and gave her a series of steroid shots from 1998 to either 2000 or 2001 to help her move. (Tr. 314-15). Plaintiff advised the shots did

not "take care of the problem," but they did help her to "function more during the day" and "perform the duties of landscaper" until 2001. (Tr. 316). Plaintiff advised she last saw Dr. Saadeh in 2001, but presented to her general practitioner, Dr. Victor Bravo, from 2001 until she was incarcerated in 2005. (Tr. 317). Plaintiff advised Dr. Bravo treated her condition by prescribing Xanax, hydrocodone, amitriptyline and Darvocet. (Tr. 318). Plaintiff stated the medications made her "very tired" but made the pain bearable. (Tr. 319). Plaintiff advised the prison system would not provide her with steroid shots while she was in prison, instead giving her only ibuprofen, and that she had not taken any steroid shots since her release because she could not afford them.

Plaintiff testified that in prison, she was "on work restriction" so she was only required to keep her bed made. (Tr. 318). Plaintiff detailed her typical day as sitting and watching TV or reading a book, with ibuprofen as her only pain reliever. (Tr. 318-19). Plaintiff explained Dr. Bravo completed the disability form at her request because she was seeking assistance, food stamps, and Medicaid and the administering agencies "wanted [her] to go to work." (Tr. 320). Plaintiff testified she had not driven since October of 2001 when she almost had a wreck due to a "charleyhorse" in her leg. Plaintiff testified she was diagnosed with glaucoma in early 2005 and was instructed to see a "laser surgeon" but was incarcerated prior to her appointment. (Tr. 322-23). Plaintiff's counsel at the hearing acknowledged that if plaintiff does, in fact, have glaucoma, it is not a serious impairment. (Tr. 324).

In describing how her depression affects her, plaintiff testified she does not socialize. (Tr. 331). Plaintiff described feeling sad, angry and lonely, having crying spells, and having problems with her memory in that she begins tasks and forgets to monitor or complete such tasks. (Tr. 332). Plaintiff advised there was "a possibility" she would forget instructions given by an employer. Plaintiff testified fluorescent lights, sun light and bright light give her headaches, that she has had

this problem since 1998 but wore sunglasses to alleviate the problem, and that her doctors told her this sensitivity to light was caused by her fibromyalgia.  (Tr. 332-33).

In summarizing her condition, plaintiff explained her pain takes up all of her energy, she cannot get too hot or too cold, and that her ankles and wrists lock.  (Tr. 325).  Plaintiff averred she stopped working because of her disability after she fell pushing a lawn mower "six or seven times a week."  (Tr. 327-28).

At the hearing before the ALJ, plaintiff's counsel sought to call additional witnesses to "enhance [plaintiff's] credibility" by testifying they have observed plaintiff's disabilities and have had to help her with things.  (Tr. 326-27).  The ALJ noted counsel had gone into detail as to plaintiff's impairments and advised counsel of his concern that the witnesses' testimony would be "more of the same."  (Tr. 327).  Although plaintiff's counsel acknowledged the witnesses' testimony would not "be anything new," the ALJ stated, "Bring me one and make it quick.  Bring on the – whoever you feel is the best of the witnesses and make it quick – because we got other folks waiting."  Prior to swearing in the witness, the ALJ again reminded plaintiff's counsel, "[L]et's make this short.  We have other folks waiting."  (Tr. 329).

Katherine Adams testified she is a friend of plaintiff's, having known her 4-5 years.  (Tr. 329).  Adams testified she frequently visited plaintiff's home after her release from prison in April 2007, and had observed her impairments and disabilities.  Adams testified she had helped plaintiff wash her hair because "[i]t's real hard for her," and had accompanied plaintiff to the grocery store during which time plaintiff was able to walk alongside the cart and place items in the cart.  Adams estimated such trips were less than ½ hour long because plaintiff could not stand very long without her feet starting to hurt.  (Tr. 330).

A supplemental administration hearing was convened August 30, 2006 to hear testimony

from a vocational expert (VE).  (Tr. 338-45).  Plaintiff, however, was not present at the hearing.[7]

Upon the request of plaintiff's counsel, the hearing was continued until plaintiff could be present.

No VE testimony was heard..

On November 17, 2007, the ALJ rendered an unfavorable decision.  The ALJ, after

considering "the complete medical history" and "[a]fter careful consideration of all the evidence,"

concluded plaintiff had not been under a disability, within the meaning of the Social Security Act,

since November 21, 2003, the date plaintiff filed her application for SSI.  (Tr. 8-20).

In his decision, the ALJ found plaintiff had not engaged in substantial gainful activity since

November 21, 2003, the SSI application date, and had not engaged in work activity for a period of

at least 12 consecutive months from her alleged disability onset date of December 30, 1997.  (Tr.

13).  The ALJ found plaintiff has the "severe" impairment of fibromyalgia because such impairment

"causes significant limitations in [plaintiff's] ability to perform basic work activities" and was

"documented by the medical evidence of record, as evaluated by the State agency physicians, and

by the [ALJ] based on the overall records, including recent medical development."  The ALJ noted

plaintiff alleged disability due to memory problems and had been diagnosed with mood and pain

disorder but found plaintiff's mental problems cause no more than "mild" limitations in activities of

daily living, social functioning, concentration, persistence or pace, and had not resulted in any

episodes of decompensation, and thus found plaintiff's depression to be a non-severe impairment.

The ALJ also found plaintiff's allegations of glaucoma and sickle cell anemia as impairments were

not supported by the record through any diagnoses or actual treatment.  (Tr. 18).  The ALJ also

found plaintiff does not have an impairment or combination of impairments that meet or medically

---

[7]Counsel advised the ALJ that plaintiff had been on probation when he was retained, and that upon inquiry, he had learned plaintiff's probation had been revoked, she was incarcerated in a state jail in Dallas, Texas, and that she would not be released until approximately December 2005.

equal a listed impairment described in the Listing of Impairments under Appendix 1, Subpart P, Part 404.[8]

"After careful consideration of the entire record," the ALJ found plaintiff has the residual functional capacity (RFC) to perform the full range of light exertional level work.  (Tr. 16).  In making this finding, the ALJ averred he considered all symptoms and the extent to which all the symptoms could reasonably be accepted as consistent with the objective medical evidence and other evidence.  The ALJ noted he also considered opinion evidence as required by the regulations.  Based on such considerations, the ALJ noted the following:

- plaintiff stated she last worked with her husband in a landscaping business in 2001, but all earnings were posted to the husband's earnings;

- plaintiff states she was unable to continue to work because of the pain from fibromyalgia;

- plaintiff did not work while she was in prison from 2005-2007 due to ailments and major depression with severe memory loss, but could sit and read all day while in prison, taking Ibuprofen for pain;

- plaintiff states she has pain in her arms and shoulder, no grip strength in her hands, limitations in lifting and overhead reaching, standing 15-20 minutes before lying down to rest and sitting 15-20 minutes before her hips begin to hurt;

- plaintiff states it takes all day to clean her house, taking 15-20 minute breaks, can fix breakfast, put clothes in washer, and spend the rest of the day resting;

- plaintiff was diagnosed with fibromyalgia by Dr. Saadeh in 1998 and was treated with a series of shots which helped but is not currently taking any medication because of the expense;

---

[8]The ALJ noted prior opinions of State agency physicians concluded plaintiff's impairment neither met nor equaled the severity of any listed impairment.  Treating these opinions as expert opinion evidence of non-examining sources, the ALJ found the opinions were well reasoned and supported by the evidence of record.  (Tr. 13-14).  The ALJ determined plaintiff's mental impairments, considered singly and in combination, do not meet listings 12.04 or 12.07 under the "paragraph B" criteria and that evaluation of plaintiff's psychological impairment under the "paragraph C" criteria was not appropriate.  (Tr. 14-16).  Noting the limitations identified in the "B" criteria are used to rate the severity of mental impairments at steps 2 and 3, the ALJ "translated the [] "B" criteria findings into work-related functions" in his RFC assessment.

- plaintiff last saw her diagnosing physician, Dr. Saadeh, in 2001 and has not seen any other doctors since 2004;

- plaintiff averred a Dr. Bravo told her she was permanently disabled;

- plaintiff testified she was told by a doctor that she had glaucoma, but the records fail to substantiate such a diagnosis; and

- plaintiff stated she does not socialize, has crying spells, feels sad, has memory problems, last used marijuana in the 1980s and has been off of heroin for 20 years.

(Tr. 17).  The ALJ noted that when statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective evidence, he must make a finding on the credibility of the statements based on a consideration of the entire case record.  After "considering the evidence of record," the ALJ found plaintiff's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible."  The ALJ determined that while plaintiff complains that her symptoms are so severe as to preclude her from all sustained work activity, the medical evidence, including the assessments of her treating physician and Drs. Saralaya, Guerrero and Gradel, consultative physicians the state agency sent plaintiff to see, do not support such significant limitations.  The ALJ noted plaintiff's medical records reflect only sporadic treatment history with significant gaps, and that such treatment was essentially routine and/or conservative in nature for her fibromyalgia. The ALJ noted that although plaintiff complains of pain throughout her body, she tested negative for rheumatoid arthritis, has a normal biochemical profile and thyroid panel, and has no limitations placed on her by a treating physician.  The ALJ opined that given plaintiff's claims of disabling symptoms, he would expect to see some restrictions placed on plaintiff by one of her treating physicians but that no restrictions had been placed on plaintiff.  The ALJ also noted that while Dr.

Bravo may have stated plaintiff is "disabled," there is no indication that the doctor was familiar with the definition of "disability" for Social Security purposes.  The ALJ opined Dr. Bravo may have been referring solely to an inability to perform plaintiff's past work, a determination consistent with the ALJ's conclusions.  (Tr. 17-18).  The ALJ further noted Dr. Bravo's opinion "contrasts sharply" with the other evidence of record rendering the opinion less persuasive.  (Tr. 18).  The ALJ noted that while in prison, plaintiff primarily took Ibuprofen for pain from her fibromyalgia and opined that if plaintiff were having "quite limiting pain," she would have been prescribed a pain relieving narcotic other than the over-the-counter medication she was given.

The ALJ further noted he did not consider plaintiff's statements of "fairly limited" daily activities to be strong evidence of disability, finding plaintiff's allegedly limited daily activities could not be objectively verified with any reasonable degree of certainty, nor could the degree of limitation alleged be attributed to plaintiff's medical condition in view of the "relatively weak medical evidence."  The ALJ also noted plaintiff's work history was sporadic prior to the alleged disability onset date, December 30, 1997, calling into question whether plaintiff's continuing unemployment was actually due to medical impairments as opposed to other reasons.

The ALJ also found plaintiff's alleged symptoms and limitations attributed to glaucoma were generally inconsistent and unpersuasive, and not "entirely reliable."  Further, noting the late allegations, diagnosis, and severity of plaintiff's memory problems, as well as the limited treatment for such, the ALJ found plaintiff's daily living activities are not constricted by her memory problems.  The ALJ concluded plaintiff's "statements concerning her functional limitations were not supported by her complaints to treating or attending physicians or to the medical findings reported."  (Tr. 19).  The ALJ reiterated the inconsistencies in the objective medical evidence and the "general lack of support" for plaintiff's subjective statements as the reasons for not granting

significant credibility to plaintiff's complaints.  Finding the determinations of the State agency

physicians were thus well reasoned and supported by the evidence of record, the ALJ concluded

plaintiff retains the RFC "for light work with the ability to lift and carry up to 20 pounds

occasionally and 10 pounds frequently, stand, walk, or sit up to 6 hours in a 9-hour day, and

perform the other exertional duties of light work."

The ALJ found plaintiff is unable to perform her past relevant work (PRW) as a landscaper

because the exertional level of such work exceeds plaintiff's RFC for light work.  (Tr. 19).  The

ALJ noted plaintiff was 35-years-old when she filed her SSI application, defined as a younger

individual by the Social Security regulations, has at least a high school education, and is able to

communicate in English.  The ALJ found that "applying the Medical-Vocational Rules directly

supports a finding of 'not disabled'" under Rule 202.21, regardless of whether plaintiff has

transferable job skills.  The ALJ thus concluded that considering plaintiff's age, education, work

experience and RFC for a full range of light work, there are other jobs existing in significant

numbers in the national economy that plaintiff can perform.

The Appeals Council denied review of the ALJ's decision on January 6, 2008  (Tr. 4-6),

rendering the ALJ's decision the final decision of the defendant Commissioner.  Plaintiff now seeks

judicial review.

II.

STANDARD OF REVIEW

In reviewing disability determinations by the Commissioner, this Court's role is limited to

determining whether substantial evidence exists in the record, considered as a whole, to support the

Commissioner's factual findings and whether any errors of law were made.  *Anderson v.*

*Sullivan*, 887 F.2d 630, 633 (5th Cir. 1989).  To determine whether substantial evidence of

disability exists, four elements of proof must be weighed: (1) objective medical facts; (2) diagnoses and opinions of treating and examining physicians; (3) claimant's subjective evidence of pain and disability; and (4) claimant's age, education, and work history.  *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991) (citing *DePaepe v. Richardson*, 464 F.2d 92, 94(5th Cir. 1972)).  If the Commissioner's findings are supported by substantial evidence, they are conclusive, and the reviewing court may not substitute its own judgment for that of the Commissioner, even if the court determines the evidence preponderates toward a different finding.  *Strickland v. Harris*, 615 F.2d 1103, 1106 (5th Cir. 1980).  Conflicts in the evidence are to be resolved by the Commissioner, not the courts, *Laffoon v. Califano*, 558 F.2d 253, 254 (5th Cir. 1977), and only a "conspicuous absence of credible choices" or "no contrary medical evidence" will produce a finding of no substantial evidence.  *Hames v. Heckler*, 707 F.2d at 164.  Stated differently, the level of review is not *de novo*. The fact that the ALJ <u>could</u> have found plaintiff to be disabled is not the issue.  The ALJ did not do this, and the case comes to federal court with the issue being limited to whether there was substantial evidence to support the ALJ decision.

## III.
## ISSUES

Plaintiff was found not disabled at Step Five of the five-step sequential analysis.  Therefore, this Court is limited to reviewing only whether there was substantial evidence in the record as a whole supporting the finding that plaintiff retained the ability to perform other work that exists in significant numbers in the regional and national economies, and whether proper legal standards were applied in making this determination.  Although unclear, plaintiff appears to present the following issues:

1.     The ALJ's finding that plaintiff has the RFC for light work is not supported

by substantial evidence because plaintiff cannot perform work for the length
of time necessary to constitute "substantial, gainful activity";

2.       The ALJ did not cite valid reasons for finding plaintiff not disabled,
         therefore, there is not substantial evidence to support his finding of non-
         disability; and

3.       The ALJ did not meet his burden of proof at Step Five of showing there is
         "other work existing in significant numbers that [plaintiff] is able to perform
         in a substantial manner" considering her RFC.


IV.
MERITS

A.
RFC and Substantial Gainful Activity

By her first ground, plaintiff appears to argue the ALJ's finding that plaintiff has the RFC

for a full range of light work is not supported by substantial evidence because plaintiff cannot

perform light work for the "length of time" necessary to constitute "substantial gainful activity."

Plaintiff argues that working "less than a full day's work is not 'substantial'" and, therefore, the

ALJ's RFC finding can not stand.  Plaintiff also appears to argue the ALJ committed legal error

when he defined light work as requiring standing, walking or sitting "up to 6 hours in an [sic] 9

hour day" as Fifth Circuit precedent requires a plaintiff be able to perform a full day's work, minus

a reasonable time for lunch breaks.

Plaintiff appears to contend the ALJ's finding that plaintiff's impairment of fibromyalgia is

"severe" at Step Two in the disability sequential evaluation process precludes a finding that she can

perform the daily length of work requirements for light work.[9]  As evidence precluding plaintiff

---

[9]Regulations define the scope of the term "severe impairment":

> If you do not have any impairment or combination of impairments which significantly limits your physical or
> mental ability to do basic work activities, we will find that you do not have a severe impairment and are,
> therefore, not disabled.

from performing the length of work requirements of light work plaintiff cites to the May 19, 1998

report of Dr. Saadeh which, after detailing plaintiff's reported symptoms of extreme pain, found no

abnormal findings upon examination and testing, but stated as the doctor's impression:  "this patient

has fibromyalgia which is quite severe."  (Tr. 148-49).  This single report is the only medical record

from Dr. Saadeh in the administrative file.  Plaintiff also appears to argue the Medical

Release/Physician's Statement by Dr. Bravo on June 22, 2004 indicating plaintiff's fibromyalgia is

a permanent disability rendering her "unable to work, or participate in activities to prepare for work,

at all," is also evidence precluding a finding that plaintiff can perform the length of work

requirements of light work.  (Tr. 165).  Plaintiff notes none of the physicians who examined her

questioned the severity of her pain, and only one consulting physician found her impairment to be

non-severe based upon his findings that plaintiff "did not show significant functional impairment"

despite her diagnosis of fibromyalgia, and that the "alleged limitations due to symptoms are not

supported by the [medical evidence of record]."

There has been no showing, however, that an ALJ's finding that a plaintiff's impairment is

"severe" at Step Two of the Social Security regulations, in and of itself, precludes a subsequent

finding in the sequential analysis that a plaintiff can perform the full range of light work as defined

under the regulations.  In fact, plaintiff's argument is foreclosed by the nature of the sequential

analysis itself which provides the specific framework for determining the range and exertional level

of work an individual can still perform after considering the effects of a severe impairment on the

individual's ability to perform work-related tasks, *i.e.*, without a "severe" impairment at Step Two,

---

20 C.F.R. §§ 404.1520(c) & 416.920(c) (emphasis added).  In *Stone v. Heckler*, 752 F.2d 1099 (5th Cir. 1985), the Fifth Circuit
clarified the proper standard to be utilized in determining whether a claimant's impairment is severe:

> [A]n impairment can be considered as not severe only if it is a slight abnormality [having]such minimal
> effect on the individual that it would not be expected to interfere with the individual's ability to work,
> irrespective of age, education or work experience.

the remaining steps are never reached.

Secondly, the May 19, 1998 medical report is not conclusive evidence that plaintiff is precluded from performing the length of work requirements of light work.  The report from Dr. Saadeh, one of plaintiff's two treating physicians, reflects an examination of plaintiff that was essentially normal with no significant back pain, joint pain, joint swelling, effusion, stiffness, or cyanosis.  (Tr. 148-49).  Plaintiff had full range of motion; she was alert and oriented; her sensory and motor functions were intact; and she reported no morning stiffness or swelling in her joints.  Dr. Saadeh noted all plaintiff's tests were negative for systemic lupus and rheumatoid arthritis and her thyroid panel was normal.  (Tr. 149).  Nonetheless, apparently based on plaintiff's statement of symptoms alone, Dr. Saadeh stated plaintiff had "quite severe" fibromyalgia.  Dr. Saadeh did not indicate if his determination was based on an evaluation of the extensiveness of systems affected by plaintiff's impairment, the level of symptoms suffered from her impairment, the severity of her impairment due to the non-responsiveness of previous "regular" treatment for her impairment, or from her subjective complaints alone.  Dr. Saadeh did not address the severity of any of plaintiff's symptoms from her impairment, including pain, prescribed physical therapy and a low dose of an anti-depressant, did not place any restrictions on plaintiff or set forth other accommodations for her impairment, and indicated he would consider injection therapy at a followup in two months.  The record does not contain further records from Dr. Saadeh.  The report, itself, does not preclude a finding that plaintiff could perform a full range of light work or the time requirements for performing such work.

Nor has plaintiff demonstrated the ALJ's RFC finding for light work cannot stand because one of her two treating physicians, Dr. Bravo, completed the June 22, 2004 Medical Release/Physician's Statement indicating plaintiff is permanently disabled from work, as well as

participation in activities preparing for work, due to fibromyalgia.  Although Dr. Bravo opined

plaintiff was permanently disabled due to fibromyalgia, he provided no further explanation of the

basis for his opinion other than that plaintiff "has seen Dr. Saadeh in past for this."  The

administrative record reflects plaintiff made only three (3) visits to Dr. Bravo prior to the

completion of the release/statement, two (2) in 1999 and one (1) in May 2002, more than two (2)

years prior to the completion of the release/statement.[10]  Moreover, these treatment records from Dr.

Bravo reflect only conservative treatment for plaintiff's condition (mild or moderate pain

medication refills and a vitamin B12 shot), normal lab findings, with the first visit finding that

plaintiff was "doing reasonably well."  (Tr. 160-76).  Although a treating physician's opinion on

any issue must be considered, a determination of disability is a legal conclusion rather than a

medical opinion and, thus, is not given special significance in the ALJ's determination and need not

be analyzed under the factors set out in 20 C.F.R.§ 404.1527(d) for evaluating the medical opinion

of a treating physician.  *See Frank v. Barnhart*, 326 F.3d 618, 620 (5th Cir. 2003).  The

determination of plaintiff's "disability" remained solely an issue reserved for the ALJ and plaintiff

has not demonstrated the release/statement by Dr. Bravo itself precluded a finding that plaintiff can

perform the full range of light work.

     Plaintiff also maintains the ALJ was "wrong as a matter of law" when he stated, at the end

of his RFC assessment, that plaintiff has the RFC for light work with the ability to "stand, walk, or

sit up to 6 hours in an [sic] 9 hour day."  Plaintiff cites case law where the Court found 2-3 hours

per month of sedentary paperwork did not amount to engaging in "substantial gainful activity"

---

[10]The undersigned does note Dr. Saadeh, in his 1998 report, indicated lab reports from Dr. Bravo were negative as to various ailments, however, no reports from Dr. Bravo prior to January 20, 1999 are included in the administrative record.

rendering the claimant ineligible for disability benefits."[11]  *See Tucker v. Schweiker*, 650 F.2d 62, 64 (5th Cir. 1981) (citing *Johnson v. Harris*, 612 F.2d 993, 997-98 (5th Cir. 1980) (new evidence from a treating physician limiting a plaintiff's productive activity to four hours a day created good cause for remand to the ALJ for additional findings); *Cornett v. Califano*, 590 F.2d 91, 94 (4th Cir. 1978) (the ability to work only a few hours a day or to work only on an intermittent basis is not the ability to engage in "substantial gainful activity")).

The RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis, and a "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule.  *See* Social Security Ruling (SSR) 96-8p at *2, 1996 WL 374184.  The Physical RFC Assessment form utilized by the Administration questions whether an individual can sit, stand, or walk for "about 6 hours in an 8-hour workday" and most RFC findings in ALJ decisions reflect this format.  Plaintiff appears to argue the ALJ's misstatement of the maximum hours of a regular and continuing basis work day renders the ALJ's decision void "as a matter of law."

The ALJ's reference to a 9-hour workday, a clear misstatement as to the maximum hours of a work day, appears to simply be a typographical error, especially considering the typical format utilized in most decisions.  The undersigned has not seen any reference in prior decisions to a 9-hour workday, and plaintiff has not demonstrated the ALJ intended any special, one-time extended workday to apply specifically to plaintiff's case.  This court applies the harmless error doctrine in Social Security disability cases where the error does not impact the outcome of the case and

---

[11]The issue in that case involved the statutory definition of disability requirement that an individual be unable "to engage in any substantial gainful activity" under 42 U.S.C. § 416(i)(1) rather than the subsequent regulations under 20 C.F.R. § 416.920, and .972. Under the statute, the term "disability" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."

therefore prejudice the claimant.  *See Frank v. Barnhart*, 326 F.3d at 622; *Morris v. Bowen*, 864 F.2d 333, 336 (5th Cir. 1988) (finding that where an error does not render the ALJ's determination unsupported by substantial evidence, it does not prejudice the plaintiff's substantive rights and is only harmless error).  Plaintiff has not demonstrated the ALJ's referencing a 9-hour workday prejudiced her substantive rights.

The ALJ found plaintiff had the RFC to perform the full range of light work.  The ALJ considered Dr. Bravo's opinion of plaintiff's disability (opinion evidence), but elected not to give it controlling or significant weight because he found the extent to which plaintiff's symptoms could reasonably be accepted as consistent with the objective medical evidence did not support the opinion.  While Dr. Bravo's opinion may not necessarily "contrast[] sharply with the other evidence of record . . . render[ing] it less persuasive," such opinion clearly lacked an objective medical basis based on the three (3) medical reports which existed at the time of the opinion, which reports are included in the administrative record.  The ALJ was free to reject the opinion of any physician where the evidence supported a contrary conclusion.  *See Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir. 1995).  The ALJ's analysis of the medical evidence was thorough, his assessment of plaintiff's impairments was appropriate, and his evaluation of plaintiff's RFC was supported.

Plaintiff appears to argue she conclusively demonstrated the disabling nature of her pain by way of the treating physician's reports which indicate she has fibromyalgia, their descriptions of her condition as severe or disabling, and her testimony.  Plaintiff maintains the ALJ did not cite any evidence contrary to these findings.  Plaintiff concludes that since this report was not rebutted, she proved her pain is disabling and, therefore, the ALJ's finding that plaintiff has the RFC for light work is not supported by substantial evidence.

If, in fact, the ALJ had accepted, as credible, all of plaintiff's testimony and statements regarding her inability to function, plaintiff's argument would probably prevail and the ALJ would have awarded benefits. The ALJ, however, did not so find and, instead, determined plaintiff's allegations that her symptoms are so severe as to preclude her from all sustained work activity were not credible to the extent alleged. The ALJ's discretionary decision was not without sufficient evidentiary support.

While plaintiff was in prison, the minimal restrictions of no climbing and assignment only to a lower bunk were imposed. It does not appear, however, that these restrictions would prohibit plaintiff from performing all work, notwithstanding plaintiff's testimony that she was only required to keep her bed made. Further, although there is a record that reflects plaintiff did not have a job assignment, such record did not indicate such was due to a medical, physical disability. These minimal restrictions and limited work assignments are not necessarily inconsistent with the ALJ's finding that plaintiff maintains the RFC for a full range of light work. Moreover, there is nothing in the record indicating any restrictions, work or otherwise, were continued by any physician after plaintiff's release from prison in 2007.

Plaintiff's testimony as to her extreme limitations because of pain from her fibromyalgia appear to contradict the findings made during physical examination that she demonstrated normal, unrestricted movement and no atrophy. It is within the ALJ's discretion to determine the debilitating nature of pain and such determination is entitled to considerable deference from this Court. *Jones v. Bowen*, 829 F.2d 524, 527 (5th Cir. 1987). Here, the ALJ found plaintiff's allegations of disabling pain were not credible to the extent alleged and concluded plaintiff was not precluded, by her pain, from performing light work. The undersigned does not find there to be present objective medical evidence supporting plaintiff's subjective complaints *to the degree*

*necessary* to reverse the ALJ's decision.  Plaintiff presented her own testimony, the testimony of a friend who stated she would sometimes help plaintiff wash her hair, the one-time report of a treating physician that plaintiff's fibromyalgia was "severe," and a disability finding by a treating physician based on treatment by the former physician.  While the objective medical evidence establishes plaintiff does have an impairment that could reasonably be expected to produce pain, there are no additional comments or findings from a medical professional.  The finding that her impairment could reasonably be expected to produce pain does not mandate a determination that the intensity, persistence or functionally limiting effects of her pain is disabling.  That determination remains for the ALJ and, as stated above, is entitled to deference.  Plaintiff's testimony as to the extent of her symptoms does not appear consistent with the findings from her physical examinations.  These subjective complaints were found by the ALJ to be credible only to the extent that she is limited to light work.  Plaintiff has failed to demonstrate her fibromyalgia prevents her from performing the requirements of light work.  Considering the deference to which the ALJ's determination of the disabling nature of pain is entitled, there is substantial evidence to support the ALJ's finding that plaintiff has the RFC to perform light work.

## B.
### Invalid Reasons for Finding of Non-Disability

In her second ground, plaintiff appears to argues the ALJ's ultimate finding that plaintiff is not disabled is not supported by substantial evidence because the ALJ cited "fallacies" as reasons for his holding of non-disability, and committed "flagrant errors of reasoning or reference."  By this, plaintiff appears to argue the ALJ's finding of non-disability was based solely on his credibility assessment of plaintiff and was not based on substantial evidence.

Plaintiff initially argues that when an ALJ doubts the severity of a plaintiff's condition, he must consider the testimony of all witnesses who have observed the severity. Plaintiff contends the ALJ was reluctant to hear the testimony of plaintiff's witnesses and, in fact, was hostile, rude, and condescending to the one witness he did allow to testify. Plaintiff contends this violated 20 C.F.R. 416.923(3).[12] The witness, Ms. Adams, testified she visited plaintiff frequently between April 2007 and July 2007, had helped plaintiff wash her hair because "[i]t's real hard for her," and had accompanied plaintiff to the grocery store. Plaintiff contends the ALJ totally ignored this testimony in determining plaintiff's RFC because a "person who requires help with washing her hair" is not capable of performing the full range of light work.

During the hearing the ALJ asked plaintiff's counsel if the witnesses plaintiff wished to call could provide any information plaintiff had not already provided in her testimony or if it would be cumulative testimony. Plaintiff's counsel admitted the witnesses would not be providing "anything new" but were requested to "enhance [plaintiff's] credibility." (Tr. 326-27). The ALJ allowed Ms. Adams to testify, questioned her, and the record does not indicate plaintiff's counsel objected to the ALJ's questioning, and/or manner of questioning, of the witness. The ALJ referenced Ms. Adams's testimony that she had "helped [plaintiff] with washing her hair, doing household chores and shopping" in his decision but did not find the testimony established that plaintiff "requires help with washing her hair." (Tr. 14). To the extent plaintiff contends the ALJ committed reversible legal error in his treatment of this witness and her testimony, plaintiff's argument is without merit. Further, the ALJ gave plaintiff the option to call her "best" witness. There is no evidence of any of the other proposed witnesses' purported testimony.

---

[12]This section states that the Administration will consider the combined effect of all impairments in determining whether the impairments are of a sufficient medical severity as to be disabling. This section does not contain a subsection (3).

In his decision, the ALJ noted that "[b]ecause a claimant's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone," he was required to consider other factors in addition to the objective medical evidence when assessing the credibility of the claimant's statements.[13]  Plaintiff argues the ALJ failed to show substantial evidence of these other factors in discrediting plaintiff's statements as to the severity of her symptoms in that he did not cite "a single symptom that contradicts disability."

The ALJ, however, detailed plaintiff's testimony at the hearing and information provided in the record as to each of the factors.  The ALJ, "[a]fter considering the evidence of record," found [plaintiff's] medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that [plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible."  Noting plaintiff alleged her symptoms are so severe as to preclude her from all sustained work activity, the ALJ then detailed the medical evidence, explaining why such evidence did not support such significant limitations.  The ALJ then noted inconsistencies between plaintiff's testimony and the medical evidence concerning her alleged glaucoma and sickle cell anemia which indicated information provided by plaintiff generally may not be entirely reliable.  The ALJ noted plaintiff's statements as to her daily activities could not be objectively verified, stated it was difficult to attribute such a degree of physical limitation to plaintiff's impairment as opposed to other reasons, and detailed why he found plaintiff's daily living activities were not constricted by her memory problems.  The ALJ noted the

---

[13]Title 20 C.F.R. § 416.929 lists the following factors relevant to symptoms, such as pain, that the Administration will consider: (1) your daily activities; (2) the location, duration, frequency, and intensity of your pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms; (5) treatment, other than medication, you receive or have received for relief of your pain or other symptoms; (6) any measures you use or have used to relieve your pain or other symptoms; and (7) other factors concerning your functional limitations and restrictions due to pain or other symptoms.

opinion evidence of the consulting physicians that plaintiff's physical and mental problems were non-severe were considered to be expert opinions, were well reasoned, and were supported by the evidence of record.  The ALJ then noted plaintiff's alleged limitations were not supported by her statements to treating physicians, by the medical findings reported, or by the inconsistent objective medical evidence.  The ALJ concluded, given this general lack of support, that he could not grant significant credibility to plaintiff's subjective statements.

The ALJ properly considered the factors and other evidence.  Moreover, the ALJ evaluated plaintiff's credibility in accordance with proper legal standards in determining plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely credible.  Judgment as to the credibility of plaintiff's testimony is the province of the ALJ.  *See Carrier v. Sullivan*, 944 F.2d 243, 247 (5th Cir. 1991).  Plaintiff has not shown the ALJ failed to support his determination that the severity of plaintiff's impairment was not credible to the extent alleged.

Plaintiff next argues the ALJ erred by "ignor[ing] the opinions of the prison medical doctors" in making his determination of non-disability.  Plaintiff appears to argue her prison records support the credibility of her complaints that she cannot do any sustained work activity and establish her disability.

Plaintiff was incarcerated from 2005 to 2007 and, at the hearing, testified she was not required to do any work in the prison other keep her bed made.  (Tr. 318).  Plaintiff contends this testimony was "without contradiction" and is another "example of the ALJ's ignoring or rejecting all the evidence which contradicts his theory that [plaintiff] is capable of six hours of light work in one day."  TDCJ "Health Summary for Classification" forms dated January 17, 2006 and May 3, 2006, however, indicated plaintiff's work assignments were to be limited to those without climbing,

and that her bunk assignment was restricted to lower bunks (due to her reported health care problem of fibromyalgia existing for the previous 10 years).  (Tr. 237, 277, 296).  The forms also reflected plaintiff's job was "jc unassigned pending assignment."  Plaintiff's argument that the prison documents irrefutably supported her claims, by way of medical evidence, that she is unable to perform any level of sustained work activity and that the ALJ erred in giving more weight to these records is without merit.

Further, the ALJ stated Dr. Bravo's opinion that plaintiff is permanently disabled "contrasts sharply with the other evidence of record."  (Tr. 18).  Presumably as an example of such other evidence, the ALJ noted that while in prison, plaintiff's treatment for her fibromyalgia consisted solely of ibuprofen for her pain.  The ALJ elaborated, opining that "[i]t would seem" that if plaintiff was experiencing such a degree of pain as limiting as alleged, the prison would have prescribed her a "pain relieving narcotic [rather] than the over the counter medication she was given."

Plaintiff argues the ALJ made "another flagrant error in reasoning by inferring that, because the prison physicians did not provide her with high-powered narcotics, her pain must be only mild."  Plaintiff asserts the Texas prison system has a "very strict policy against providing narcotics to prisoners," that the ALJ should have been aware of such policy, and that it was error for the ALJ to infer plaintiff's pain was mild when the prison would not, pursuant to policy, administer narcotics to plaintiff even if necessary for her pain.[14]  While there may be merit to plaintiff's argument regarding TDCJ's reluctance to prescribe narcotic pain medication as a matter of course, no evidence of any "official" policy prohibiting the prescription of narcotics was provided, nor was there any evidence that TDCJ will not administer stronger pain relieving drugs if medically

---

[14]Plaintiff's counsel indicated he was attaching, to his brief, a letter he submitted to the Appeals Council as evidence of this policy.  No such attachment was included with plaintiff's brief.

necessary.  It was not error for the ALJ to note plaintiff's exclusive use of over-the-count

medication for mild pain for the two years she was in prison as "other evidence" which contrasted

with Dr. Bravo's indication that plaintiff was permanently disabled.  Nor was it error for the ALJ to

infer plaintiff's pain is not as limiting as alleged considering the extended use of the mild pain

reliever.  *See Griego v. Sullivan*, 940 F.2d 942, 944-945 (5th Cir. 1991) (finding that the use of only

over-the-counter pain relievers suggests that the severity of the pain is not so great as to preclude

work activity).  The Court does not find reversible error in this instance.

Plaintiff also argues the ALJ's determination of non-disability sharply contrasts with other

evidence of record.  Plaintiff contends the ALJ has not shown any evidence that plaintiff has the

RFC for any significant work, much less six hours of work.  Plaintiff contends the only evidence the

ALJ could have relied upon to support his RFC finding was the June 3, 2004 statement of Dr.

Wiley, a state agency medical consultant, who opined plaintiff's medically determinable

impairment of fibromyalgia was a non-severe physical impairment.  (Tr. 150).  Plaintiff argues the

ALJ relied upon this opinion in error and that the report should be disregarded because the ALJ did

not explain the weight accorded to such opinion.[15]  Plaintiff further contends every examining

physician either stated her "pain" was quite severe, or "did not imply any skepticism of her

complaints of pain."  Plaintiff appears to conclude, based on this state of the medical evidence, that

the ALJ's finding of non-disability is not supported by substantial evidence.

As detailed throughout this Report and Recommendation, there is substantial evidence in the

record to support the ALJ's determination of non-disability.  Although plaintiff alleged her pain was

so severe it precluded her from all sustained work activity, the objective medical evidence does not

---

[15]The ALJ found plaintiff's fibromyalgia <u>was</u> a severe physical impairment.  (Tr. 13, Finding 2).  Consequently, it appears the ALJ did not rely on this consultative report.

support such significant limitations.  The ALJ discussed every piece of medical evidence in the

record and accorded  various weights to the medical evidence as is his prerogative.  In addition to

the limited medical evidence from plaintiff's treating physicians, Drs. Bravo and Saadeh, the record

also includes reports from two consultative examinations performed on plaintiff.  Critically, at the

May 11, 2004 consultative examination with Dr. Saralaya, plaintiff exhibited a normal gait; the

ability to stand on her toes and heels; the ability to squat half way; normal range of motion in her

cervical spine and upper extremities; only slightly reduced range of motion in her lower extremities;

and no swelling, deformity, or redness.  (Tr. 154-55).  On January 22, 2005, Dr. Guerrero

performed another consultative examination on plaintiff.  (Tr. 184-85).  Again, plaintiff's physical

examination was essentially normal with no cyanosis or clubbing; normal gait and station; no signs

of ataxia or unsteadiness; no tenderness to palpation on her spine; no evidence of inflammation,

effusion, or swelling in her joints; negative straight leg raising sign; 5/5 motor strength in all muscle

groups tested; symmetric and normal sensory exam; normal deep tendon reflexes; normal handgrip;

and normal fine finger movements.  (Tr. 184-85).  Plaintiff could also handle small objects; get on

and off of the examination table without difficulty; stand on heels and toes, bend all the way over

and back, and squat all the way down and rise without difficulty; and she did not require an

assistive device.  (Tr. 184-85).  The medical evidence, while clearly establishing plaintiff's

fibromyalgia as a medically determinable impairment and the level of severity required by the

regulations to continue past Step Two in the sequential evaluation, is not strong with regard to

establishing the limiting effects of the symptoms of her impairment.  While pain is an expected

symptom of this disorder, the ALJ was required to evaluate the intensity, persistence and limiting

effects of plaintiff's pain to determine the extent to which the pain limited her ability to do basic

work activities.  Plaintiff's subjective statements about the intensity, persistence, or functionally

limiting effects of pain or other symptoms was not substantiated by the objective medical evidence, even if such evidence did not specifically reflect "skepticism."  A claimant's testimony by itself cannot satisfy the medical component of the statutory standard.  *See* 20 C.F.R. §§ 416.928(a), 416.929.  Plaintiff has failed to demonstrate reversible error by the ALJ in his explanations of the weight given to the medical evidence, his credibility determinations, or the weight given to third-party information..

Plaintiff also objects to what she describes as the ALJ's general discussion of "stuff that various doctor's suggested the claimant might have," statements purportedly based on the ALJ's conjecture, and other alleged misstatements of the record.  Plaintiff appears to be arguing the ALJ cited irrelevant reasons as the basis for his non-disability finding.  The Court has thoroughly reviewed the record and finds nothing to support plaintiff's argument.

Lastly, plaintiff argues the ALJ's credibility finding cannot be considered as evidence to support his finding of non-disability.  Plaintiff contends the ALJ's rejection of her claim of disability is "premised almost entirely on his expressed doubts as to her credibility" and argues "mere disbelief" of allegations cannot substitute as substantial evidence to support the ALJ's finding.  Plaintiff makes the conclusive statement that the ALJ presented no "real valid basis for his disbelief," but then notes that even if he had, once again, mere disbelief is not substantial evidence and an RFC finding must be supported by medical evidence.

The ALJ assessed plaintiff's subjective allegations in accordance with proper legal standards.  The ALJ's evaluation of the credibility of subjective complaints is entitled to judicial deference if supported by substantial record evidence.  *See Villa v. Sullivan*, 895 F.2d 1019, 1024 (5th Cir. 1990).  As noted throughout this Report, the ALJ's decision through Step Four, through which plaintiff carried the burden of proof, is supported by substantial evidence and not merely by a

credibility finding.  There was no reversible error committed.

## C.
## Step Five

By her third ground, plaintiff argues the ALJ did not meet his burden of proof at Step Five of showing there is "other work existing in significant numbers that [plaintiff] is able to perform in a substantial manner considering her RFC."  Plaintiff notes the ALJ determined plaintiff has a "severe" impairment of fibromyalgia, meaning her impairment has more than a minimal effect on her ability to perform basic work activities, that the effect of her impairment prevents her from performing work at a higher exertional level than light work, and that her previous work as a landscaper exceeds the light exertional level.  Plaintiff then cites to her testimony that she can only sit for 15-20 minutes at a time and appears to argue that such a sitting limitation would necessarily require a frequent sit/stand option.  Plaintiff appears to then argue that with such an extensive sit/stand option, the ALJ was required to call a VE to testify that there are light jobs in significant numbers in the national economy to accommodate standing every 15-20 minutes.  Plaintiff appears to argue that by failing to call a VE to testify as to an adequate number of jobs in the national economy that plaintiff can perform with this option, the ALJ failed to prove "other work existing in significant numbers" that plaintiff can perform.

Although the ALJ considered plaintiff's testimony regarding the extent of her physical limitations caused by her impairment, the ALJ did not and was not required to give full credence to the testimony or modify his RFC findings around it.  *Cf. McGeorge v. Barnhart*, 321 F.3d 766, 769 (8th Cir. 2003) (the ALJ need only limit his RFC determination to include those impairments and associated limitations that he finds credible based on the evidence as a whole).  The ALJ found the

extent of plaintiff's alleged physical limitations could not be objectively verified with any reasonable degree of certainty and, even if plaintiff limited herself as she alleges, it would be difficult to attribute that degree of limitation to her medical condition in view of the relatively weak medical evidence.  Although not specifically alleged in this ground, plaintiff has not demonstrated the ALJ erred in failing to include such a frequent or restrictive sit/stand option in his RFC.  Nor has plaintiff demonstrated the ALJ did not meet his burden of going forward with evidence that plaintiff was able to perform other work in the national economy by use of the Grids of Appendix 2, Subpart P of the Regulations.  *See Perez v. Heckler*, 777 F.2d 298, 300-301 (5th Cir. 1985).  The ALJ chose to rely on the Grids, specifically Grid Rule 202.21, to find plaintiff was not disabled. When a claimant suffers only from exertional impairments, or non-exertional impairments that do not significantly affect the claimant's RFC, the ALJ may rely exclusively on the Grids in determining whether there is work available that the claimant can perform.  *See Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990).

To the extent plaintiff argues the ALJ submitted no evidence of other work she could perform given her RFC, the undersigned notes the Grids represent approximately 1,600 separate light (or sedentary), unskilled occupations plaintiff could perform.  *See* SSR 83-10 at *3, 1983 WL 31251.  The Grids take administrative notice of the existence of jobs in the national economy that a person falling within the guideline could fill.  *Perez v. Heckler*, 777 F.2d at 301.

Lastly, to the extent plaintiff argues the ALJ committed reversible error because he applied the wrong grid rule, the undersigned finds no reversible error.  Plaintiff contends she did not obtain her GED and, thus, use of Grid Rule 202.21 for high school graduates was in error. The record, however, contains documentation indicating plaintiff reported obtaining her GED

(Tr. 112, 251, 283),  as well as obtaining a certified nursing assistant (CNA) license.  (Tr. 283).

Even so, plaintiff reported at the hearing that she failed the GED examination.  (Tr. 306).

Whether or not plaintiff did, in fact, obtain her GED, however, does not change the result

reached in applying the Grid.  The Grid rule for a younger individual with a high school

education (Rule 202.21) directs the same finding of "not disabled" as the Grid rule for an

individual with a limited education (Rule 202.17).  Any error by the ALJ in applying the wrong

Grid rule was harmless because plaintiff would have been found "not disabled" under either rule.

 "Procedural perfection in administrative proceedings is not required" and a judgment will not be

vacated "unless the substantial rights of a party have been affected."  *Mays v. Bowen*, 837 F.2d

1362, 1364 (5th Cir. 1988).  Plaintiff has not demonstrated any harm.


V.<br>CONCLUSION

The ALJ's findings have sufficient evidentiary support when viewing  the record as a

whole.  Plaintiff has not shown the ALJ applied improper legal standards in reaching his

decision.  No reversible error has been shown.


VI.<br>RECOMMENDATION

It is the opinion and recommendation of the undersigned United States Magistrate Judge

to the United States District Judge that the decision of the defendant Commissioner finding

plaintiff not disabled and not entitled to a period of SSI benefits be AFFIRMED.

VII.

<u>INSTRUCTIONS FOR SERVICE</u>

The United States District Clerk is directed to send a copy of this Report and

Recommendation to each party by the most efficient means available.

IT IS SO RECOMMENDED.

ENTERED this <u>6th</u> day of September, 2011.

_____

CLINTON E. AVERITTE

UNITED STATES MAGISTRATE JUDGE

**\* <u>NOTICE OF RIGHT TO OBJECT</u> \***

Any party may object to these proposed findings, conclusions and recommendation.  In the event parties wish to object, they are hereby NOTIFIED that the deadline for filing objections is fourteen (14) days from the date of filing as indicated by the "entered" date directly above the signature line.  Service is complete upon mailing, Fed. R. Civ. P. 5(b)(2)(C), or transmission by electronic means, Fed. R. Civ. P. 5(b)(2)(E).  **Any objections must be filed on or before the fourteenth (14th) day after this recommendation is filed** as indicated by the "entered" date.  *See* 28 U.S.C. § 636(b); Fed. R. Civ. P. 72(b)(2); *see also* Fed. R. Civ. P. 6(d).

Any such objections shall be made in a written pleading entitled "Objections to the Report and Recommendation."  Objecting parties shall file the written objections with the United States District Clerk and serve a copy of such objections on all other parties.  A party's failure to timely file written objections to the proposed findings, conclusions, and recommendation contained in this report shall bar an aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings, legal conclusions, and recommendation set forth by the Magistrate Judge in this report and accepted by the district court.  *See Douglass v. United Services Auto. Ass'n,* 79 F.3d 1415, 1428-29 (5th Cir. 1996); *Rodriguez v. Bowen,* 857 F.2d 275, 276-77 (5th Cir. 1988).